# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**ANNE E. CRIST,**

                  **Plaintiff,**

-vs-                                          **Case No.  3-:04-CV-010**

**LIBERTY LIFE ASSURANCE COMPANY**
**OF BOSTON, et al.,**

                                       **Judge Thomas M. Rose**

                  **Defendants.**

---

**ENTRY AND ORDER PROVIDING LONG-TERM DISABILITY BENEFITS TO ANNE E. CRIST; GRANTING CRIST'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #35); OVERRULING LIBERTY LIFE ASSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. #32) AND TERMINATING THE CASE**

---

This cause arises from the disability of Plaintiff Anne E. Crist ("Crist"). Crist was employed by Defendant Information Handling Services, Inc. ("IHS") for approximately twenty-three years. During the time Crist worked for IHS, she was a participant in the Defendant IHS Group Health, Life and Disability Plans for All Employees (the "Plan"). During the relevant time, IHS self-insured a period of long-term disability benefits under the Plan and purchased a Group Long Term Disability Policy (the "Policy") from Defendant Liberty Life Assurance Company of Boston ("Liberty") for additional long-term disability benefits. Liberty administered the disability benefits provided under both the Policy and the Plan.

Sometime prior to January 21, 2001, Crist became disabled, and she was granted the short-term disability benefits that were self-insured by IHS and were provided pursuant to the Plan. When her short-term disability benefits expired, Crist was provided long-term disability

benefits that were self-insured by IHS pursuant to the Plan. After the self-insured long-term disability benefits were used, Crist was granted long-term disability benefits that were provided pursuant to the Policy issued by Liberty. After two years, Crist's long-term disability benefits were terminated by Liberty on the basis that she was able to perform work in other jobs within her training and experience. Crist's appeal of this denial of continued benefits by the Policy was denied.

Crist then filed a five-count Complaint. Count I is an ERISA claim, Count II is against IHS and the Plan for breach of contract, Count III is against Liberty for breach of contract, Count IV is against all defendants for promissory estoppel and Count V is for declaratory judgment.

Pursuant to Liberty's Partial Motion for Judgment On the Pleadings (doc. #2), Counts III and IV of Crist's Complaint, as they apply to Liberty, relate to Crist's ERISA claim and have been DISMISSED. As a result, Crist's claim against Liberty for punitive damages has also been DISMISSED. Further, Count V of Crist's Complaint against Liberty is either preempted or subsumed by her ERISA claim and has, therefore, been DISMISSED. Finally, Crist's remaining ERISA demands against Liberty are equitable in nature and thus not subject to trial by jury.

Pursuant to IHS and the Plan's Motion for Partial Judgment On the Pleadings, Counts II, IV and V against IHS and the Plan were dismissed because they relate to Crist's ERISA claim As a result, Crist's claim for punitive damages against IHS and the Plan were dismissed. In addition, Crist is not entitled to a trial by jury with regard to her ERISA claim against IHS and the Plan.

As a result of Liberty's Partial Motion for Judgment On the Pleadings and IHS and the Plan's Motion for Partial Judgment On the Pleadings, only Count I of Crist's Complaint, which

is an ERISA claim, remains to be adjudicated. Finally, the application of ERISA to the long-term disability plan that is the subject of this action is undisputed.

Pursuant to the Sixth Circuit's direction, actions regarding the denial of ERISA benefits are resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). Now before the Court is Crist's Motion for Judgment On the Pleadings or, in the alternative, Motion for Summary Judgment On the Administrative Record (doc. #35) and Liberty and IHS's Motion for Summary Judgment (doc. #32.) Both will be treated, in accordance with Sixth Circuit instructions, as Motions for Judgment On the Administrative Record.

The Administrative Record ("AR") has been filed. The Parties have filed Responses (doc. #38, 39) and both have filed Replies (doc. #40, 41.) The Motions for Judgment On the Administrative Record are, therefore, fully briefed and now ripe for decision.

A factual background will first be set forth. The factual background will be followed by the standard of review for claims to recover benefits due under the terms of a plan subject to ERISA and an analysis of the Cross Motions for Judgment on the Administrative Record.

## I. FACTUAL BACKGROUND

Crist was born on December 4, 1953 and began working for IHS on April 1, 1978. (AR 62, Claim note 14.) When she claimed disability in January of 2001, Crist was a regional sales director. (Id.) As a regional sales director, Crist did not work out of corporate offices, she either traveled or worked out of her home. (AR 61, Claim note 23.)

## A. The Plan

Because of her employment status and the number of hours she worked for IHS, Crist was a participant in the Plan. (AR 3, 81.) The Plan provides three tiers of disability benefits. For the first thirteen weeks after becoming disabled, IHS self-insures a short-term disability program that is administered by Liberty. (AR 586.) After that period, IHS self-insures and Liberty administers the initial twelve weeks of long-term disability coverage. After these first twenty-five weeks, Liberty insures and administers the remainder of the long-term disability coverage pursuant to the Policy. Therefore, the continuation of long term disability benefits after the first two tiers that are self insured by IHS would depend upon whether Crist was disabled within the meaning of the Policy. (Id.)

**B. Relevant Terms of the Policy**

To satisfy, in part, benefits provided by the Plan, IHS purchased the group disability income insurance Policy from Liberty. (AR 1.) The Policy was effective April 1, 2005 and was administered by Liberty. (AR 1,12, 24.) Specifically, the Policy provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (AR 24.)

Pursuant to the terms of the Policy, an insured is entitled to disability benefits for up to twenty-four months if the insured "is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness." (AR 6.) This is known as the "own occupation" provision. (Id.)

The benefits continue beyond the twenty-four months only if the insured "is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any

-4-

other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity." (Id.) This is known as the "any occupation" provision. (Id.)

Pursuant to the Policy, an Injury is a "bodily impairment resulting directly from an accident and independently of all other causes." (AR 7.) Further, "[a]ny Disability which begins more than 60 days after an Injury will be considered a Sickness for the purpose of determining benefits under this policy." (Id.)

Disability benefits are provided by the Policy:

When Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty proof of continued:
    1. Disability, and
    2. Regular attendance of a Physician.

(AR 12.)

Benefits from Other Income are deducted from the monthly disability benefit. (AR 12.) Benefits from Other Income include Workers' Compensation benefits, other insurance benefits, certain retirement benefits and benefits received under the United States Social Security Act. (AR 16.) To be deductible, the Benefits from Other Income must be payable as a result of the same disability for which the Policy pays a benefit. (Id.) Also, Liberty has the right to recover in full the amount of any overpayments as a result of, for example, returning to work or as a result of receiving Benefits from Other Income. (Id.) Regarding one form of benefits from other income, the Policy requires the insured to apply for Social Security Disability Benefits if the disability is expected to extend for twelve months. (AR 478.)

Liberty initially determined that Crist **was** disabled under the "own occupation" provision of the Policy. It then determined that she **was not** disabled under the "any occupation" provision of the Policy. It is the determination under the "any occupation" provision that is now being challenged by Crist. Having set forth the relevant provisions of the Policy, the factual background turns to the procedural history of this matter.

## C. Procedural History

On or before January 22, 2001, Crist became disabled within the meaning of the Plan and made application to IHS for short term disability benefits. (AR 73.) On April 12, 2001, Liberty approved short-term disability benefits for Crist through April 27, 2001. (AR 594.) This end date was extended to June 3, 2001, while Liberty was awaiting additional medical information. (Id.)

Prior to the expiration of her short-term disability benefits and, based upon the permanency of her disability, Crist applied for the self-insured long-term disability benefits under the Plan and insured long-term disability benefits under the Policy. (AR 557, 560-65, 586, 592.)

Also, as required by Liberty and the Policy, Crist applied for Social Security on June 14, 2001. (AR 159.) On August 26, 2003, following Crist's appeal and a rehearing, the Social Security Administration determined that Crist was disabled as defined by the Social Security Act and was entitled to a period of disability beginning on January 22, 2001 and to disability insurance benefits. (Id.)

On June 20, 2001, Liberty approved the self-insured long-term disability benefits for Crist through July 22, 2001, pursuant to the provisions of the Plan. (AR 557.) Then, on September 18, 2001, Liberty approved insured long-term disability benefits for Crist pursuant to

the Policy. (AR 477.) In the approval letter, Liberty said that Crist's date of disability was January 24, 2001, and that her benefits under the terms of the Policy begin as of July 23, 2001. (Id.)

On July 24, 2003, Liberty determined that Crist was not entitled to long-term disability benefits after July 23, 2003. (AR 270-73.) Liberty determined that Crist had the ability to perform with reasonable continuity the occupations of Market Research Analyst, Inside Sales Account Manager/Executive, Market/Sales Analyst, Customer Service Manager and Inside Sales Supervisor and, therefore, did not meet the "any occupation" definition of disability. (Id.) As a result, according to Liberty, Crist was not entitled to long-term disability benefits beyond July 23, 2003. (Id.)

After receiving the notice of termination, Crist notified Liberty of her intention to request a review of the denial of the continuation of her benefits. (AR 252-54.) Crist also requested a copy of all documents relative to her long-term disability case. (Id.) After receiving the requested documents, Crist filed her appeal on October 17, 2003. (AR 142-68.)

In a letter dated November 17, 2003, Liberty denied Crist's appeal. (AR 118-23.) The letter denying further long-term disability benefits indicates that the benefits were initially approved through July 23, 2003, based upon Crist's "diagnoses seronegative rheumatoid arthritis, fibromyalgia, hyperlipidemia, chronic fatigue syndrome and diplopia."(Id.) However, the denial of benefits after July 23, 2003 was, "based upon your physical capacity and the ability to perform any occupation given your training, education and experience." (Id.) Crist then filed this lawsuit on January 14, 2004. The factual background next turns to a summary of Liberty's actions in addressing Crist's claims.

**D. The Processing and Denial of Crist's Claim for Disability Benefits**

On September 18, 2001, Liberty sent Crist a letter approving her claim for disability benefits under the Policy. (AR 477-79.) Liberty determined that Crist was disabled as of January 24, 2001, and that her disability benefits would begin on July 23, 2001. (Id.). Liberty later informed Crist that disability benefits were approved from July 23, 2001, through July 23, 2003, based upon the diagnoses of seronegative rheumatoid arthritis, fibromyalgia, hyperlipidemia, chronic fatigue syndrome and diplopia and pursuant to the "own occupation" definition of disability. (AR 118.)

As the end of the period of "own occupation" disability neared, Liberty sent Crist's records, including video tapes, to Dr. Anna Matthew for a medical record review which was completed and documented on February 4, 2003. (AR 354-56.) Dr. Matthew is a board-certified internal medicine and occupational medicine specialist. (AR 119.)

Dr. Matthew concluded that the medical evidence submitted by Crist supported diagnoses of fibromyalgia, hypothyrodism, obstructive sleep apnea with periodic limb movements and dysmetabolic syndrome. (AR 354-56.) Dr. Matthew found the diagnosis of seronegative rheumatoid arthritis to be questionable. (Id.) Crist's treatment had been appropriate to date, according to Dr. Matthew, but the current medical evidence did not substantiate an inability for remunerative activity. (Id.) Dr. Matthew found that the information provided by Liberty did not "warrant total and permanent disability, even if the effects of all are combined." (Id.) She concluded that, "based on my review of the medical records, discussing her case and review of the video tape, it is my opinion that with a rehabilitative type of physical therapy and

-8-

aggressively treating her sleep apnea, she should be able to work full time at the sedentary type of work that she holds." (Id.)

Next, based upon Liberty's suggestion and the agreement thereto by Dr. Matthew and Dr. Jo Yvette Pelfrey, a two-day Functional Capacity Evaluation ("FCE") was conducted by HealthSouth Rehabilitation Center of Dayton. (AR 356.) Dr. Pelfrey was Crist's treating physician.

The FCE took place on March 25 and 26, 2003, and was conducted by Paul R. Turner. (AR 334-43.) Turner's report from the FCE concluded that Crist "would more effectively tolerate SEDENDTARY physical demands of work for a typical 8 hour work day according to the standards of the US Department of Labor." (AR 334.)

The FCE results where then communicated to Dr. Pelfrey for review. (AR 312.) Liberty asked Dr. Pelfrey to provide any comments on the FCE and to detail the specific areas with which she disagreed. (Id.) Dr. Pelfrey was also asked to provide medical documentation to support her position. (Id.)

Dr. Pelfrey responded that Crist was seen in her office every 3 months or sooner, if needed and that Crist "has continuous pain, severe most of the time, everyday." (AR 313.) Dr. Pelfrey also responded that Crist "is unable to exercise regularly and her daily living activities are limited due to the pain.'" (Id.) Dr. Pelfrey noted that, "[t]he key word is 'sustained,'" and indicated that Crist "can on rare occasion work almost a full day, but then she is set back for several days with severe pain and fatigue afterwards." (Id.)

Dr. Pelfrey attached a letter from Dr. Michael J. Valle, a neurologist, to her response. (Id.) Dr. Valle, indicated that he had seen Crist on March 20, 2002, and noted no changes since

his initial assessment. (AR 314-15.) He diagnosed fatigue and excessive daytime sleepiness due to fibromyalgia, mild positionally dependent obstructive sleep apnea, and periodic limb movements. (Id.) Also, Dr. Valle could not totally exclude a central nervous system hypersomnia due to remote encephalitis. (Id.)

Following receipt of the FCE and prior to obtaining the response from Dr. Pelfrey, Liberty referred Crist's case to Mary Paine O'Malley, a vocational/disability consultant. (AR 38.) In a Transferable Skills Analysis ("TSA") report dated April 12, 2003, O'Malley identified several "potential alternative occupations" that appeared to be consistent with Crist's skills, education and work experience. (AR 316-325.) According to O'Malley, the TSA was based upon the sedentary functional capacity outlined by Dr. Matthew and the FCE. (Id.)

Liberty then engaged Dr. Ron Koppenhoefer, a physiatrist, to conduct an Independent Medical Examination ("IME"). Dr. Koppenhoefer examined Crist on May 19, 2003. (AR 292-295.) Dr. Koppenhoefer referred to certain medical records that were provided by Crist at the time of the IME and certain medical records and surveillance videos that were provided by Liberty. (Id.) He found no objective evidence of musculoskeletal pathology but did find a neurological impairment of the sixth nerve paralysis. (Id.) Dr.Koppenhoefer concluded that Crist's "subjective complaints outweigh the objective findings at this time." He noted that the surveillance tapes showed Crist to be capable of doing more physical activities that what Crist said she was doing and concluded that he found no objective evidence to indicate that Crist was unable to perform sedentary work "at this time for an eight hour day." (Id.)

The IME results were then sent to Dr. Pelfrey. Liberty received no response from Dr. Pelfrey at the time.

On July 24, 2003, Liberty sent Crist a letter informing her that she would not be entitled to long-term disability benefits after July 23, 2003. (AR 270-73.) As a basis for this determination, Liberty indicated that Crist's "complete claim file" was sent for an independent medical review. (Id.) The letter stated that, according to the medical record review done by Dr. Matthew in February 2003, Crist was capable of "full time sedentary to light work capacity, if not more." (Id.) Liberty next indicated in the letter that a two-day FCE was conducted which concluded that she was capable of performing full time sedentary capacity work. (Id.) The letter then says that the FCE results were sent to Dr. Pelfrey who disagreed but did not provide objective medical information to support her disagreement. (Id.)

Liberty next indicates in the letter that Crist was sent to Dr. Koppenhoefer for the IME. (Id.) Liberty writes that Dr. Koppenhoefer indicated that Crist is capable of full time sedentary work capacity and that Dr. Pelfrey did not respond to Dr. Koppenhoefer's conclusions. (Id.)

Liberty next indicates that Crist's file was sent to a vocational specialist after the IME.[1] (Id.) The vocational specialist, according to the letter, determined that Crist was capable of performing several potential occupations. (Id.)

After receiving Liberty's July 24th letter, Crist appealed the decision that she was not entitled to long-term disability benefits under the "any occupation" Policy definition of disability.(AR 142-68.) In her appeal letter dated October 17, 2003,[2] Crist indicated that she had been approved for Social Security Disability Benefits[3] and attached a notice of this decision by

---

[1] However, this is incorrect because the IME was conducted on May 19, 2003 (AR 292) and the TSE performed by the vocational specialist is dated April 12, 2003 (AR 316-25). (See also AR 37-38.)

[2] The letter indicates that it was sent on October 17, 2002. However, Crist and Liberty (AR 32) both indicate that it was sent on October 17, 2003, and it contains documents dated after October 17, 2002, and before October 17, 2003.

[3] Crist was required by Liberty to apply for Social Security Disability Benefits. (AR 478.)

the Social Security Administration. (Id.) Crist also indicated that the Social Security Act's

definition of "disability" and the Policy's definition of "other occupation" disability are

substantially the same.

As part of her appeal, Crist also indicated several alleged errors that she had found in the

surveillance tape and associated report. (Id.) Regarding this surveillance, Crist summarized the

alleged errors stating that,

> Ironically, in eighteen days of surveillance, over an eight-month period, I was seen 6
> times. I was seen on two of the six days because of the mandatory functional capacity
> assessment ("FCA") required by Liberty Mutual in March of 2003. Liberty Mutual's own
> case notes depict the disappointment with such limited activity. Therefore, Liberty
> Mutual's own surveillance reports validate very minimal activity on my part. Moreover,
> the surveillance video taken on both March 25th and March 26th substantiate my
> incapacity after each day of the FCA.

(AR 147.)

Regarding the IME, Crist indicates in her appeal that Dr. Koppenhoefer examined her for

approximately 25 minutes. (AR 148.) She further indicates that both Dr. Koppenhoefer and the

staff at HealthSouth had her confused with the next appointment, a woman who apparently had a

back problem and was pursuing a Workers' Compensation claim. (Id.) Finally, Crist identifies

several errors that she believes are contained in Dr. Koppenhoefer's report. (Id.)

Crist also indicates in her appeal that Dr. Pelfrey did respond to Liberty's letter dated

June 2, 2003. This letter sought Dr. Pelfrey's opinion of the IME and Liberty indicates that it

was not received before its decision to terminate Crist's long-term disability benefits. Crist

included a copy of this response along with her appeal. (AR. 148.) Dr. Pelfrey's response is in

the form of a note written on page 4 of the IME report whereon Dr. Pelfrey indicates on July 15,

2003, that, "since there is no reliable test for fibromyalgia, subjective complaints are very important in determining a patient's condition." (AR 168.)

In a letter dated November 17, 2003, Liberty denied Crist's appeal. (AR 118-23.) This letter confirms Liberty's findings as presented in Liberty's letter of July 24, 2003, and re-indicates that the denial of benefits after July 23, 2003 was, "based upon your physical capacity and the ability to perform any occupation given your training, education and experience." (Id.) This denial indicates that Liberty considered Dr. Pelfrey's opinion, but, "based on the totality of the three independent medical opinions and vocational information contained in your file, our previous decision that you have sedentary capacity is reasonable and substantiated by the record." (AR 122.)

Crist then filed this lawsuit on January 14, 2004. Having set forth the factual background, the analysis turns to the standard of review for ERISA claims.

## II. STANDARD OF REVIEW

A participant or beneficiary of an ERISA qualified plan may bring suit in federal court to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). When an ERISA plan administrator's decision to deny *benefits* is brought before a court, the court engages in a de novo review of the decision unless the benefit plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Where the plan administrator is given no discretionary authority by the plan, review by the court is de novo with respect to both the factual determinations as well as the legal conclusions of the plan administrator. *Id.* Where there is a clear grant of discretion, the court

applies an arbitrary and capricious standard of review to the administrator's decision to deny

benefits. *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6ᵗʰ Cir. 1994), *cert. denied*, 513

U.S. 1058 (1994).

       The Sixth Circuit does not require a plan to use any magic words such as "discretionary"

to create discretionary authority for a plan administrator in administering the plan. *Johnson v.*

*Eaton Corp.*, 970 F.2d 1569, n.2 (6ᵗʰ Cir. 1992). Yet the Sixth Circuit has consistently required

"a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo

review with the arbitrary and capricious standard. *Wulf*, 26 F.3d at 1373.

       In this case, it is undisputed that Liberty is given discretionary authority to administer the

Policy. Therefore, the arbitrary and capricious standard will be applied.

## A. Application of the Arbitrary and Capricious Standard

       When applying the arbitrary and capricious standard, a court is to decide if the plan

administrator's decision was rational in light of the plan's provisions. *Shelby County Health*

*Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d

926, 933-34 (6ᵗʰ Cir. 2000) (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6ᵗʰ Cir. 1988),

*cert. denied*, 488 U.S. 826 (1988)). A decision is not arbitrary and capricious if it is based upon a

reasonable interpretation of the plan. *Johnson*, 970 F.2d at 1574.

       When applying arbitrary and capricious review, courts affirm administrative decisions

"when it is possible to offer a reasoned explanation, based on the evidence, for a particular

outcome …." *Davis By and Through Farmers Bank and Capital Trust Company of Frankfort,*

*Kentucky v. Kentucky Finance Companies' Retirement Plan*, 887 F.2d 689, 693 (6ᵗʰ Cir. 1989),

*cert. denied*, 495 U.S. 905 (1990). Therefore, the administrator's decision must be supported by

evidence. *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). In sum, the decision of the administrator is upheld if it is the result of a deliberate principled reasoning process, if it is supported by substantial evidence and if it is based upon a reasonable interpretation of the plan. See *id.* at 520 (quoting *Baker v. United Mine Workers of America Health and Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

On the other hand, indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker. *Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002). Also, a decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005). Experts retained by the plan administrator must be given all of the pertinent medical records upon which to base their recommendations. *Id.*; *Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)(insurer's action in sending only a physical capacities evaluation to the expert performing a transferable skills analysis was arbitrary and capricious); *Williams v. International Paper Co.*, 227 F.3d 706, 713 (6th Cir. 2000)(plan administrator acted arbitrarily and capriciously by not considering additional medical evidence submitted with an appeal).

**B. "Differential Review Is Not No Review"**

While the arbitrary and capricious standard is deferential, "it is not, however, without some teeth." *McDonald v. Western-Southern Life Insurance Co.*, 347 F.3d 161, 172 (6th Cir. 2003). "'Deferential review is not no review,' and 'deference need not be abject.'" *Id.* (quoting *Hess v. Hartford Life & Accident Insurance Co.*, 274 F.3d 456, 462 (7th Cir. 2001)). Therefore,

the Court's obligation includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. *Id.*

**C. Administrative Record and Post Hoc Rationalizations Thereof**

Absent a procedural challenge to the administrator's decision, the court's review is limited to the administrative record of the benefit determination. *Wilkins,* 150 F.3d at 619. Further, while reviewing the administrative record, the Court may not consider a post hoc explanation of an administrative body's decision. *University Hospitals of Cleveland v. Emerson Electric Co.*, 202 F.3d 839, n.7 (6th Cir. 2000). Administrators and their attorneys are not permitted to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation. *Id.*

**D. Application of the "Arbitrary and Capricious" Standard To This Case**

The arbitrary and capricious standard requires the Court to consider whether Liberty used a deliberate principled reasoning process, if the process used is supported by evidence in the AR and if Liberty's interpretation of the Policy was reasonable. Further, Liberty may not arbitrarily refuse to credit reliable evidence presented by Crist, but Liberty is not required to accept the opinions of Crist's treating physicians. *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). However, the Court's consideration of Liberty's decision is limited to a review of the evidence available to Liberty at the time the final decision was made. *Miller v. Metropolitan Life Insurance Company*, 925 F.2d 979, 986 (6th Cir. 1991). Therefore, Liberty's reasoning process will be analyzed with regard to the evidence available to and used by the decisionmakers at Liberty.

**E. Conflict of Interest**

-16-

In this case, Crist argues that the Court's application of the arbitrary and capricious standard of review should be tempered by the existence of an alleged conflict of interest. A conflict of interest is to be weighed as a factor in determining whether the plan administrator's decision was arbitrary or capricious. *Firestone*, 489 U.S. at 115.

A conflict of interest occurs when the company or plan administrator is the insurer that ultimately pays the benefits. *Gismondi v. United Technologies Corp.*, 408 F.3d 295, 299 (6th Cir. May 24, 2005)(citing *Killian* 152 F.3d at 521). For example, the Sixth Circuit has recognized that a conflict of interest occurs where a company both funds and administers a plan because the company incurs a direct expense as a result of the allowance of benefits and it benefits directly from the denial or discontinuation of benefits. *Killian*, 152 F.3d at 521. In another example from the Sixth Circuit, an actual conflict of interest exists when an insurer both decides whether an employee is eligible for benefits and pays those benefits. *Darland v. Fortis Benefits Insurance Company*, 317 F.3d 516, 527 (6th Cir. 2003), overruled on other grounds, *Nord*, 538 U.S. 822.

A conflict of interest also occurs when a plan administrator, who ultimately pays the benefits, contracts with individuals, including physicians, for opinions. The plan administrator has a clear incentive to contract with individuals, including physicians, who are inclined to find in its favor. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).

**F. Medical Opinions**

Also, in this case, the Parties discuss the issue of the weight to be given to the opinion of Crist's treating physician. Plan administrators may not ignore the opinions of treating physicians but they are not required to give special deference to them. *Boone v. Liberty Life Assurance Co.*

-17-

*of Boston*, 161 Fed.Appx. 469, 473-74 (6th Cir. 2005). Further, a plan administrator may not credit the opinion of a treating physician if the plan requires that the treating physician's opinion be supported by objective medical evidence and it is not. *Id.* at 473. Finally, when a plan administrator elects to rely upon the medical opinion of one doctor over that of another, the plan administrator's decision cannot be said to have been arbitrary or capricious so long as it is possible to offer a reasoned explanation, based upon the evidence, for the decision. *McDonald*, 347 F.3d at 169.

**G. The Receipt of Social Security Benefits**

       Finally, the Parties discuss the treatment of the Social Security Administration's ("SSA's") decision to grant Social Security Benefits to Crist. An SSA determination, while not binding, is also not meaningless. *Calvert*, 409 F.3d at 294. The SSA determination, at a minimum, may support the conclusion that an administrative agency charged with examining the claimant's records found support for the treating physicians opinions. *Id.* Further, it is "inconsistent for a plan administrator to ignore the SSA's favorable determination, after the administrator had expressly requested the claimant to apply for SSA benefits." *Borys v. Metropolitan Life Insurance Co. MetLife Disability*, Case No. 03CV1162, 2005 WL 1037469 at * 6 (S.D.Ohio May 4, 2005)(citing *Whitaker v. Hartford Life and Accident Insurance Co.*, 404 F.3d 947 (6th Cir. 2005)); *see also*, *Calvert, 409 F.3d at 294; Pierce v. Kentucky Utilities Company's Long Term Disability Plan*, 357 F.Supp.2d 979, 989 (E.D. Ky. 2005). Having set forth a factual background and the standard of review for ERISA claims, the analysis next turns to the cross Motions for Judgment On the Administrative Record.

**III. CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Crist argues that Liberty's decision to deny her appeal was arbitrary and capricious. Crist also argues that Liberty has at least two conflicts of interest. The first is a conflict because Liberty both funds and administers the Policy. The second is a conflict because Liberty relies upon opinions by medical experts whom it has chosen and paid.

Liberty argues that its decision to deny long-term disability benefits under the "any occupation" definition of disability was not arbitrary and capricious. Liberty's Motion for Judgment On the Administrative Record sets forth a reasoning process using the evidence in the AR. Liberty now argues that the evidence in the AR shows that Crist was capable of performing the duties of sedentary work and shows that Crist failed to demonstrate that she is incapable of work and any occupation.

However, rather than rely upon Liberty's post hoc rationalization, the evidence identified by Liberty will first be set forth followed by the issues raised by Crist. This will be followed by an examination of Liberty's reasoning process in light of the issues raised by Crist and the evidence in the AR, including the evidence now identified by Liberty.

**A. Evidence Identified In Liberty's Motion**

Liberty first points to a CT scan of Crist's head performed by Dr. John German on September 3, 1998. (AR 543.) Dr. German reviewed the scan and concluded that it was negative and normal. (Id.)

Liberty next points to a letter written on August 4, 2000, to Dr. Daniel P. Juergens by Crist. (AR 368.) In the letter, Crist requests copies of her medical records and indicates that she will be filing for long-term disability benefits and asks that Dr. Juergens support her in her efforts. (Id.)

-19-

The next evidence that Liberty identifies is Dr. Pelfrey's progress note from November 3, 2000. (AR 644.) The note indicates that Crist was seen for a facial infection and swelling on the right side of her nose. (Id.) It also lists several medications that Crist was taking and increases the dosage of synthoid. Crist is shown as normal/no problem with HEENT/neck, lungs, heart, neuro, EXT's, back, skin and hair. (Id.) Ten days later Dr. Pelfrey's progress note indicates that Crist's nose was still red and swollen. (AR 643.)

Liberty next identifies the report of Dr. Ronald Fadell. (AR 640.) Dr. Fadell conducted a CT scan on Crist's head on November 21, 2000, and reported the results as "normal study." (Id.)

The next evidence identified by Liberty is a report from a consultation by Crist with Dr. Marianne Shaw at the Cleveland Clinic dated January 3, 2001. (AR 507.) Dr. Shaw reported that she found no evidence of active rheumatoid arthritis and agreed with Dr. Stevens, Crist's rheumatologist, that Crist's current symptoms seem consistent with fibromyalgia. (Id.) Dr. Shaw did, however, report that Crist had 18 of 18 fibromyalgia tender points and mild puffiness of her ankles with no definite synovitis. (Id.) Dr. Shaw noted that Dr. Stevens saw no improvement with arthritis medications and no worsening when the arthritis medications were discontinued. (Id.) Finally, Dr. Shaw thought it important to conduct a sleep apnea test and explained the importance of aerobic exercise to Crist. (Id.)

Crist then saw Dr. Pelfrey on January 15, 2000, as a follow up to Crist's evaluation at the Cleveland Clinic. (AR 642.) Dr. Pelfrey followed Dr. Shaw's suggestions and set up a Sleep Clinic evaluation and increased Crist's prozac and synthroid prescriptions. (Id.) Dr. Pelfrey also asked Crist to return in one month. (Id.)

Then, when Crist returned on February 12, 2001, physician assistant Michael Yoggi saw Crist. (AR 641.) In the progress note for this visit, under the topic "impression," Yoggi indicated, as had Dr. Pelfrey on the previous visit, that Crist had fibromyalgia. Under the "plan" section of the note, where Dr. Pelfrey had previously set up a sleep clinic visit and increased certain medications, Yaggi indicated that Crist was totally and permanently disabled due to severe fibromyalgia and seronegative rheumatoid arthritis. (Id.) Dr. Pelfrey signed off on Yaggi's conclusions thereby indicating agreement. (Id.)

Liberty suggests that the reason for including diagnoses of totally and permanently disabled due to severe fibromyalgia and seronegative rheumatoid arthritis in the progress notes of February 12, 2001, is that Liberty sent a "Restrictions Form" to Dr. Pelfrey to help assess Crist's disability. However, the Restrictions Form was completed by Dr. Pelfrey on February 15, 2001, after the February 12 visit and there is no evidence or reason to suspect that Dr. Pelfrey or Yaggi saw the forms from Liberty before completing the progress notes on February 12. (AR 653.)

Liberty next points to information on the Restrictions Form. (Id.) The Form indicates diagnoses of RA Rheumatoid Arthritis, hyperlipidemia, chronic fatigue syndrome, fibromyalgia and diplopia. (AR 653.) The Attending Physician's Statement completed, along with the Restrictions Form, by Dr. Pelfrey indicates diagnoses of rheumatoid arthritis and fibromyalgia. (AR 654-55.) Yet, the diagnosis of rheumatoid arthritis is contrary to the findings by Dr. Stevens and Dr. Shaw, experts to whom Crist had been referred, that Crist did not suffer from rheumatoid arthritis.

The Attending Physician's Form also indicates that Crist had chronic myalgias and arthralgias since 1988. (Id.) Yet, as Liberty points out, Crist worked from 1988 to 2001 and Dr. Pelfrey does not mention what changed in early 2001.

On the Physical Capacities Form, Dr. Pelfrey indicates that Crist is incapable of sitting, standing or walking for one hour and is incapable of carrying any weight. (AR 656.) Dr. Pelfrey also indicates that, "Anne is totally, permanently disabled from work due to chronic pain associated with rheumatoid arthritis and she also has diplopia due to encephalitis and fibromyalgia which is severe." (Id.) Again, according to Liberty, contrary to Dr. Stevens's and Dr. Shaw's conclusion that Crist does not suffer from rheumatoid arthritis.

Liberty next points to Dr. White's evaluation of Crist at the Kettering Sleep Disorders Center on February 20, 2001. (AR 536-38.) Dr. White reports that Crist "typically goes to bed around 11 p.m. and can fall asleep within one hour." (Id.) He also reports that Crist "awakens at 6:30 a.m., but still is quite tired." (Id.) Upon physical examination, Dr. White found Crist to be "a well-developed, well-nourished white female in no apparent distress." (Id.) He noted that Crist "has a long history of excessive daytime sleepiness associated with loud snoring and episodes of awakening gasping for air" which is consistent with possible obstructive sleep apnea (Id.) Dr. White also noted that Crist "appears to have "a significant problem with periodic limb movements of sleep and restless leg syndrome." (Id.) In addition, he suspected that Crist had a problem with idiopathic hypersomnolence. (Id.) Dr. White recommended that Crist undergo an overnight polysomnogram and a Multiple Sleep Latency Test. (Id.)

On April 10, 2001, Dr. White conducted the tests that he had recommended. (AR 532-35.) Based upon the tests, Dr. White concluded that Crist had sleep apnea syndrome with

-22-

periodic limb movement disorder. (Id.) He also concluded that Crist demonstrated significant daytime sleepiness. (Id.)

Liberty next points to a letter dated April 2, 2001 from Dr. Pelfrey "To Whom It May Concern." The physical capacities identified in this letter, according to Liberty, are far different from those identified on the Physical Capabilities Form that Dr. Pelfrey completed on February 9, 2001. The letter indicates Crist has fibromyalgia and that prolonged activity like sitting in a car or on an airplane exacerbates the pain and stiffness. (AR 492-93.) The letter also indicates that, "[l]ifting heavy objects repetitively also causes severe pain and suffering" and that Crist cannot concentrate which affects her ability to manage complex issues as needed for her position.(Id.)

Liberty argues that these physical capabilities are "far different" from the Physical Capabilities Form. (AR 656.) On the Physical Capabilities Form, Dr. Pelfrey indicated that Crist was only able to sit, stand or walk for less than one hour and is not capable of lifting/carrying any weight. (Id.)

Dr. Pelfrey saw Crist again on May 14, 2001. The progress notes from this visit indicate that Crist had sleep apnea, restless leg syndrome, HL, GERD, fibromyalgia, and hypothryoid. (AR 525.) Dr. Pelfrey changed one of Crist's medications and noted that Crist "has been approved for short term disability - long term will probably follow." (Id.)

Liberty next points to the forms completed by Dr. Pelfrey on July 11, 2001, for the Ohio Bureau of Disability Determination in regard to Crist's claim for Social Security disability benefits. (AR 515-24.)  On these forms, Dr. Pelfrey indicates that Crist has a full range of motion of cervical and/or lumbo-sacral spine with some difficulty. (AR 516.) Dr. Pelfrey also indicates

that Crist has essentially a full range of motion in her spine but this was accomplished with a lot of pain. (AR. 517.) Dr. Pelfrey also reported that x-rays showed a mild scoliosis. (Id.) Dr. Pelfrey noted no loss of fine or gross dexterity and a full range of wrist motion. (AR 519-20.) He also noted that persistent, unexplained fatigue was first noticed about 5 years ago and that Crist has had myalgias since 1987 or 1988. (AR 522.) Finally, Dr. Pelfrey reported no observable motor fatigue/muscle weakness and that Crist had undergone no therapy. (AR 523.) In sum, Dr. Pelfrey reported, in response to a list of physical and mental activities, that Crist "can do all of the  activities however with most, there is a significant amount of pain involved." (AR 524.)

Dr. Juergens, Crist's eye doctor, responded to a request from Liberty in June of 2001. (AR 539-41.) Dr. Juergens reported that Crist was being treated for diplopia,[4] that she had not reached maximum medical improvement, that she was not to operate dangerous machinery and that she had not shown for her last appointment on November 10, 1998. (AR 539-41.)

Crist was later seen by Dr. Liston at Dayton Eye Associates. Dr. Liston reported on February 21, 2002, that Crist indicated that the diplopia had become more noticeable in the past 6 months. (AR 375.) The implications of his examination of Crist on February 21, 2002 were strabismus and diplopia. (AR 375.) The treatments discussed by Dr. Liston were prism in glasses, sx or no tx. (Id.) Liberty also identifies a letter of May 20, 2002, from Crist to Dr. Liston wherein Crist indicates that her double vision is worsening and asks for Dr. Liston's efforts to explain the current status of her specific problem to Liberty and the Social Security Administration. (AR 382.)

---

[4]Diplopia is a form of double vision.

Liberty next points to progress notes from Crist's visit to Dr. Pelfrey on July 9, 2001. (AR 512-13.) The sleep clinic results were noted and Crist's medications were not changed. (Id.) Crist reported pain in her left leg, hip, knee and ankle that was getting worse. (Id.) Dr. Pelfrey's diagnoses are sciatica, hypothryoid, seronegative rheumatoid arthritis, sleep apnea, fibromyalgia, GERD and HL. (Id.) Also, Crist was sent for an x-ray which showed a mild degenerative alteration and minimal scoliosis. (AR 513.)

On December 7, 2001, Crist was seen by Dr. Michael Valle on a neurologic consultation. (AR 410-16.) Dr. Valle reports a history of rheumatoid arthritis, fibromyalgia and hypothyroidism including a family history of fibromyalgia in Crist's sister. Dr. Valle's diagnostic impression is that Crist had no characteristics of a central nervous system demyelinating disorder. (Id.) He recommended an MRI of the brain and various blood tests. (Id.) The MRI of the brain was normal. (AR 416.)

Dr. Valle conducted a reevaluation of Crist on March 20, 2002. (AR 314-15.) He noted no changes since his initial assessment and that Crist's compliance with his prescription for Mirapex has been marginal. (Id.) Dr. Valle's impressions are fatigue and excessive daytime sleepiness due to fibromyalgia, mild positionally dependent obstructive sleep apnea and periodic limb movements. (Id.) Dr. Valle restarted her dose of Mirapex and recommended that Crist engage in an aggressive stretching program. He also recommended utilizing repositioning techniques and becoming involved in a weight loss program. (Id.) Finally, Dr. Valle scheduled a follow-up examination in the next four months. (Id.)

Dr. Pelfrey was, on January 145, 2002, again asked by the Ohio Bureau of Disability Determination to complete a questionnaire pursuant to a reconsideration of the claim Crist filed

with the Social Security Administration. (AR 448-460.) Liberty argues that Dr. Pelfrey changed her answers from the previous questionnaire "even though only six months had elapsed and little to nothing had changed…"

Although the questionnaires are not exactly the same, Liberty argues that Dr. Pelfrey now indicates that Crist has extreme pain in her knees, hips, ankles when Dr. Pelfrey had not noted this on the previous questionnaire. (AR 450.) Liberty also points out that, previously, Dr. Pelfrey had indicated that there was no loss of fine or gross dexterity and now there was. (AR 452.) Also, on the earlier questionnaire, Dr. Pelfrey reported the Crist had a full range of motion in her wrists, she now reported that there was a full range of motion with pain increasing recently and that Crist has worn braces. (AR 453.) Finally, Dr. Pelfrey noted for the first time that Crist's pain increases with barometric changes, heat and humidity and with sitting and standing. (AR 455.)

On the earlier questionnaire, Dr. Pelfrey reported that Crist had persistent, unexplained fatigue and that she now had no persistent, unexplained fatigue. On the earlier questionnaire, Dr. Pelfrey noted that Crist can do all of the physical and mental activities listed but, with most there is a significant amount of pain. She now reports that the listed physical activities could be performed for less than an hour and that there could be no traveling. (AR 459.) Finally, Dr. Pelfrey continues to report seronegative rheumatoid arthritis and fibromyalgia. (AR 459.)

On March 25, 2002, Dr. Pelfrey submitted, at Liberty's request, an updated Restrictions Form. (AR 431-32.) On the updated restrictions form, Dr. Pelfrey indicated that Crist has rheumatoid arthritis, chronic fatigue syndrome, fibromyalgia, diplopia and hyperlipidemia. (Id.) Finally, Dr. Pelfrey indicates that Crist is totally and permanently disabled from work. (Id.)

Following a recitation of the selected evidence, Liberty's Motion turns to the medical record review performed by Dr. Matthew on February 4, 2003, subsequent documentation of Liberty's decision-making process, and the responses from Crist and her treating physicians. Since this review and the ensuing correspondence and reports are indicative of Liberty's decision process, they will be addressed later herein.

**B. Issues Raised by Crist**

In her Motion for Judgment On the Administrative Record, Crist raises several issues. Some regard the evidence in the AR and others regard Liberty's reasoning process. Each will next be identified and then later considered when Liberty's decision-making process is analyzed.

**1. Conflict of Interest**

In this case, Liberty has a conflict of interest because it is both the administrator of the Policy and the insurer that ultimately pays the benefits. This conflict of interest is exacerbated because all of the experts relied upon by Liberty to reach its decision that Crist is not entitled to long-term disability benefits under the "any occupation" definition of disability were either Liberty employees or individuals hired by Liberty to give them an opinion. In denying the benefits, Liberty relied upon the opinion of Dr. Matthew, the FCE performed by Paul R. Turner and the IME conducted by Dr. Koppenhoefer, all of whom are either employed by Liberty or under contract to Liberty.

**2. Predetermination**

Liberty's claim notes indicate that Crist's claim for long-term disability benefits under the "own occupation" definition in the Policy was approved by Liberty on September 11, 2001.

(AR 59, claim note 30.) Crist was notified by telephone on September 12, 2001 (AR 59, claim note 31) and by letter dated September 18, 2001 (AR 477).

However, before the final decision was made to grant the initial two years of benefits and Crist was notified thereof, the AR indicates that Liberty had already determined that Crist was not going to be eligible for long-term disability benefits under the "any occupation" definition. The AR includes an e-mail from Mary McFarren, Team Manager, Integrated Disability Management, to Claim Administrator Debra Goldsmith indicating that Crist was only going to be entitled to two years of benefits because fibromyalgia "appears to be the primary diagnosis." (AR 499.)

Liberty again predetermined before the TSA that Crist would not be eligible for benefits under the "any occupation" definition of disability. In a claim note dated April 1, 2003, a Liberty case manager indicated that Crist had transferable skills and would not be eligible for benefits under the "any occupation" definition of disability. (AR 38-39, claim note 74.) Liberty then conducted the "official" TSA which reached this same conclusion. (AR 316-25.)

These predeterminations are particularly relevant because of the nature of fibromyalgia. It is described as an "elusive and mysterious" disease whose cause or causes are unknown. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003).[5] Further, there is no known cure and its symptoms are entirely subjective. *Id.* The principal symptoms of fibromyalgia are pain all over, fatigue, disturbed sleep, stiffness and multiple

---

[5]In *Hawkins*, the claimant had worked for a period of time despite having fibromyalgia and there was no indication that the condition worsened during this period of time. 326 F.3d at 918. The claimant then sought long-term disability benefits. The Seventh Circuit opined that working for a period of time should not prevent one who suffers from fibromyalgia from becoming disabled because a desperate person might force herself to work despite an illness that everyone agreed was totally disabling. *Id.* Yet, even a desperate person might not be able to maintain the necessary level of effort indefinitely. *Id.*

tender spots at fixed locations on the body. *Id.* Finally, some people may have such a severe case of fibromyalgia as to be totally disabled from working and most do not.[6] *Id., see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Due to the nature of fibromyalgia, it was presumptuous of Liberty to conclude that Crist would be able to perform certain occupations and would not be entitled to long-term disability benefits under the "any occupation" definition without further examination, including the FCE which was later conducted. This presumption is an indication that Liberty's decision-making process regarding benefits under the "any occupation" definition was not rational.

## 3. Objective Medical Information Requirement

Liberty argues that "Crist was under a continuous obligation to demonstrate that she was unable to perform the duties of any occupation" and that "sufficient clinical medical evidence must exist in the claim file to show that Liberty Life's decision was not supported by substantial evidence…" (Mot. Summ. J. p. 8.) However, this is not a rational interpretation of the Policy nor of the law under which ERISA claims are examined.

The Policy indicates that a disability benefit may be paid "when Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician…." (AR 012.) The Policy further indicates that, "[t]he proof must be given upon Liberty's request…" (Id.) However, nowhere does the Policy include the word "continuous." Also, nowhere does the Policy require "clinical medical evidence." Further, while the law

---

[6]In *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, the Ninth Circuit determined that "somebody has to make a judgment as to whether a medical condition prevents a person from doing her work…" and the plan generally assigns this responsibility to the claims administrator. 370 F.3d 869, 878 (9th Cir. 2004). With a condition such as fibromyalgia, where the applicant's physician's diagnoses depend primarily upon the applicant's pain reports, the applicant's physician's conclusions cannot be unchallengeable. *Id.* However, the plan administrator must come forward with specific reasons for ignoring the applicant's physician's conclusions based upon substantial evidence on the record. *Id.*

requires an examination of the evidence, it does not require an examination of only "clinical medical evidence."

A part of Liberty's reasoning for declining to provide benefits was that Dr. Pelfrey, Crist's treating physician, "did not provide objective medical information" to support her disagreement with the FCE results. (AR 271.) However, the Policy does not specifically require "objective medical information" and this is particularly significant when at least one of the diagnoses was fibromyalgia where the symptoms are entirely subjective.

**4. Surveillance**

Presumably to gather additional non-clinical and non-medical evidence to use as part of its decision-making process, Liberty arranged for the covert surveillance of Crist. The AR includes surveillance reports from MJM Investigations, Inc. regarding surveillance performed on May 8, 9 and 10, August 16-18, 30 and 31, September 1, November 13, 14 and 15 and December 13, 14 and 15 in 2002, and January 18, and March 24, 25 and 26 in 2003. The AR also includes video tapes made during the surveillance on May 10, August 18 and 30, November 15 and December 13 of 2002 and March 25 and 26 of 2003.[7]

Crist informed Liberty of several relevant problems with the surveillance both before and as a part of her appeal. Liberty has responded to none of them. Each of the periods of surveillance will next be summarized along with the issues raised by Crist.

**a. May 8, 9 and 10, 2002 Surveillance**

---

[7]The label on one video tape included in the AR indicates that it was made on March 25 and 26 of 2002 but the video tape itself and the surveillance report indicate that the surveillance was performed on those dates in 2003. Also, March 25 and 26 in 2003 are the dates of the two-day FCE and the AR indicates that Liberty requested surveillance during the FCE.

The May 8, 9 and 10 surveillance report indicates a current address for Crist of 172 East Drive and a prior address of 3811 Ackerman Avenue, both in Dayton, Ohio. (AR 194-204.) Crist reports that she had not lived at 172 East Drive since 1971 and the Ackerman address is her mother-in-law's residence. While this alleged error calls MJM's quality of work into question, it does appear from the report that the surveillance took place at Crist's residence at 5537 Lotusdale Drive.

The May 10 report indicates observing a white female standing on the south-facing deck of the residence and includes a description of this person. (AR 202.) Crist says that, if any such person was observed at her residence, it was not her.

The surveillance report on May 10 indicates that Crist was observed working in her front and side garden areas during the late afternoon. (AR 196.) A video was taken on May 10 that very briefly shows the back of an individual, not identifiable from the video alone, who appears to be sitting and working in flower beds. Otherwise, Crist was not observed.

**b. August 16-18, 30 and 31, September 1, 2002 Surveillance Report**

This report indicates that the CLAIMANT was observed departing her residence with her family and traveling toward Columbus on August 18, 2002. (AR 206-19.) The CLAIMANT was observed riding as a passenger and was seen walking up and down steps at a highway rest area without assistance. A video was taken of this rest stop. Although the video is dated August 18, 2000, it presumably was taken on August 18, 2002, and shows a female, presumably Crist, walking from and to the vehicle in which she was riding.

This report also indicates that, on August 30, the "**possible** CLAIMANT was observed jogging along the neighborhood streets accompanied by a dog." (AR 208.) The report further

indicates that, "**[i]t could not be confirmed if the female documented was indeed the CLAIMANT although she appeared very similar**." (Id., emphasis added) A video was taken of the woman jogging. After viewing the video and reviewing the report, Crist informed Liberty that she was not the woman shown jogging. Of note, the investigator who reported Crist's description in the May 8, 9 and 10, 2002 Surveillance Report is not the same investigator who conducted the surveillance and observed the "**possible** claimant" on May 10. Further, the Court has viewed the video and the woman jogging does not appear to be the same woman as shown leaving and entering a vehicle on the August 18th video. The report offers no further observations of Crist or anyone who might possibly be Crist.

**c. November 13, 14 and 15, 2002 Surveillance**

This report indicates that on November 14, 2002, at approximately 1:25 p.m., "[a] large Value City delivery truck blocked the investigator's view by backing into the driveway of the Claimant's residence." (AR 182.) Crist argues that no such delivery was made to her. However, the report does not indicate that a delivery was made to Crist. It indicates only that a truck backed into Crist's driveway.

Crist indicates that the November 15th video tape shows that the delivery truck was making a delivery to her neighbor's home. However, the Court is unable to identify a delivery truck on the November 15th video tape.

This report also indicates that the Claimant was observed driving to Jade Nails, a local business and returning to her residence on November 15, 2002. A video was taken that confirms this trip and confirms that Crist was driving. No further observations of Crist were noted in this report.

On the November 15th video is also tape of a woman walking a dog. This woman is not mentioned in the surveillance report and does not appear to the Court to be the same woman as shown on the August 18th video at the rest stop or the same woman shown jogging on the August 30th video. Also, with regard to identifying Crist, the investigator on this surveillance is not the same investigator as on either of the two previous surveillances.

**d. December 13, 14 and 15, 2002 Surveillance**

This report indicates that, on December 13th, the Claimant was seen driving a white Oldsmobile Bravada approximately two miles to an elementary school and returning to her residence after about one hour. (AR 186-92.) The surveillance includes a video showing Crist driving to and from the school, exiting the vehicle and entering the school. Otherwise, the Claimant was not observed during this time period.

**e. January 18, 2003 Surveillance**

This report indicates that the Claimant was present at her residence but confined her activities to the interior thereof. (AR 221-25.) The Claimant was not observed during this time period.

**f. March 24, 25 and 26, 2003 Surveillance**

This surveillance was performed the day before and the two days of the FCE conducted on Crist. On March 24th, the day before the FCE, Crist's presence at her residence was confirmed but she was not observed. (AR 227-36.)

On March 25th, no activity was observed at Crist's home. Crist was, however, observed arriving for the FCE. After two hours inside, Crist was observed being picked up and returned to her residence by an unidentified male. A video was made on this day of Crist walking slowly,

ascending and descending steps, using her cell phone and sitting, all taking place at the location where the FCE was conducted.

Again on March 26th, no activity was observed at Crist's home. Crist was, however, observed arriving for and departing from her appointment. The report indicates that Crist "was very inactive" while she waited for the return ride to her residence. A video was made on this day of Crist walking slowly, ascending steps, sitting on steps and riding in a vehicle, all taking place at the location where the FCE was conducted. The video indicates that Crist was at the FCE for one and one half hour.

### g. Summary of Surveillance

In nineteen days of surveillance conducted over an eleven-month period, Crist was affirmatively seen six times, two of which related to the mandatory FCE commissioned by Liberty. The back of a person who was allegedly Crist was observed on May 10, 2002, working sitting in her front and side garden areas. On August 18, 2002, Crist was observed walking to and from a rest area parking lot to the restroom, on November 15, 2002, driving to and returning from Jade Nails, a local business, on December 13th, driving an automobile approximately two miles to an elementary school and returning to her residence after about one hour, and on March 25 and 26, 2003, arriving for and leaving her appointment for the FCE.

Relying upon the surveillance, Liberty's claim notes on July 8, 2002, indicate that Crist was not active on surveillance. (AR 51, MDS note.) Liberty's claim notes on January 16, 2003 indicate that "very limited driving obtained on surveillance." (AR 45, claim note 66.) Finally,

Liberty's claim notes on March 26, 2003, following the FCE, indicate that Crist was "totally inactive- went to IME[8] and then home." (AR 39, claim note 72.)

The reports and video tapes also indicate that there may have been flaws in the surveillance. While the incorrect dates and addresses may be irrelevant to the real issues, they are indicative of the quality of the surveillance and the reliance that should be placed upon it. The inclusion of videos of two women shown exercising that were not Crist is a more serious matter.

The video tapes were provided to Dr. Matthew for her medical record review completed on February 4, 2003. (AR 354-56.) Dr. Matthew concluded that the video tapes sent to her revealed Crist "to be in no distress or pain and doing a variety of functional tasks that suggested that she was functioning at that time, at least between a sedentary to a light level of work." (AR 355.)   Crist alleges that this same surveillance, including the reports and video tape, was sent to physical therapist Paul Turner who conducted the FCE. However, this allegation is not supported by the record.

Finally, surveillance reports and video tapes for the period May 8, 2002, through March 20, 2003, were sent to Dr. Koppenhoefer who conducted the IME on (AR 35, 294.) Dr. Koppenhoefer indicates that Crist's "activity noted on the surveillance tapes and records were consistent with her presentation in my office. However, the tapes did show her capable of doing more physical activities than what she presented to me as her history." (AR 295.) Dr. Koppenhoefer concluded, based upon his examination, the records that he reviewed and the surveillance, including the video tapes, that Crist "appears" capable of performing within the

---

[8]Presumably this case note is referring to the FCE and not the IME. The IME was conducted on May 19, 2003.

vocational alternatives as outlined in the April 12, 2003 Transferrable Skills Analysis Report."
(AR 295.)

**5. Liberty's Management Plan**

Liberty did not follow the management plan that is indicated in its case notes. After Crist was receiving disability benefits under the "own occupation" definition of disability, the nurse and case manager indicated that Liberty should follow-up with Crist for a progress report every two to three months. (AR 62, MDS note 7/30/01; AR 59, claim note 33.) On January 28, 2002, a case manager indicated that Crist is a likely vocational rehabilitation candidate when and if symptoms improve and are stable and an FCE can be scheduled. (AR 57, case note 47.) This plan is repeated on March 13, 2002. (AR 56, case note 53.) Then, without any indication that symptoms had improved and were stable, and with indications from treating physicians that conditions may have been worsening (AR 54, MDS notes 6/4/02), additional surveillance, an FCE, a TSA and an IME were ordered. (AR 49, MDS notes 8/8/02; AR 334-43; AR 316-25; AR 292-95.)

**6. Treating Physicians' Responses**

Liberty indicates in its July 24th letter initially denying long-term disability benefits under the "any occupation" definition of disability that the IME results were sent to Dr. Pelfrey for review and that Dr. Pelfrey has not responded to date. However, there is evidence that Dr. Pelfrey did respond. Attached to Crist's appeal of Liberty's decision is a copy of Dr. Pelfrey's response dated July 15, 2003, that, "since there is no reliable test for fibromyalgia, subjective complaints are very important in determining a patient's condition." (AR 168.)

While Liberty may not have received Dr. Pelfrey's response for some reason, it certainly considered the response when it reviewed Crist's appeal because it is quoted in Liberty's November 17th letter denying Crist's appeal. (AR 121.)

Regarding another treating physician, in January 2003, Liberty requested and received from Dr. Richard Liston, Dayton Eye Associates, updated medical records on Crist. (AR 357.) In his notes of February 2002, Dr. Liston indicates that Crist's diplopia is getting worse. (AR 360.) Liberty acknowledges that Dr. Liston's records document Crist's complaint of worsening double vision. (AR 42, MDS note 2/25/03.) However, Liberty's case notes seem to ignore the worsening and go on to say that Crist has a long standing issue of double vision and has been working with that impairment. (AR 42, MDS note 2/25/03.)

Dr. Pelfrey referred Crist to the Sleep Disorder Center for consultation with Dr. Phillip A. White regarding sleep apnea. (AR 532-35.) In a report dated April 10, 2001, Dr. White discussed his re- evaluation of Crist wherein he concluded that Crist's "multiple sleep latency test demonstrated significant daytime sleepiness." (AR 532.) Dr. White also concluded that Crist had "fairly significant pathologic daytime sleepiness. (Id.)

**7. "Reasonable Continuity" Requirement**

The "any occupation" definition in the Policy provides benefits beyond twenty-four months only if the insured "is unable to perform, **with reasonable continuity**, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age, and physical and mental capacity." (Emphasis added.) Crist now argues that the record shows that she is not able to perform any occupation

"with reasonable continuity" and that Liberty has not addressed the "reasonable continuity" requirement.

The FCE used by Liberty in its decision-making process indicates that Crist "would more effectively tolerate SEDENTARY physical demands of work for a typical 8 hour work day… and that "[h]er sustained level of function applicable to an 8 hour work day would be SEDENTARY physical demands of work…"[9] (AR 334.) No mention is made of continuity beyond an 8 hour day.

The TSA begins with the conclusion from the FCE that Crist can effectively tolerate sedentary physical demands for a typical 8 hour work day and concludes that she is capable of performing several potential occupations. Nothing is said in the TSA regarding "reasonable continuity."

Next, based upon the FCE, the TSA and other specified medical records, the IME concludes that Crist "is capable of sustaining dependable sedentary activity on an eight hours a day basis." (AR 295.) This is the first mention of "sustaining" and is not supported by the FCE or the TSA.

**8. SSA Decision**

As required by Liberty and the Policy, Crist applied for and received Social Security disability benefits. (AR 159.) The SSA determined that Crist was disabled as defined by the Social Security Act and was entitled to a period of disability beginning on January 22, 2001 and to disability insurance benefits. (Id.)

---

[9]The TSA was conducted for approximately two hours on March 25, 2003 and for approximately one and one half hours on March 26, 2003. (AR 229, video tapes of March 25th and 26th.)

In her appeal, Crist indicated that she had been approved for Social Security disability benefits and attached a notice of this decision by the SSA. Soon thereafter, Liberty indicated that it would be demanding a partial refund of the disability benefits that it had provided based upon the amount of the Social Security benefit that she would be receiving. (AR 125.)

Crist also indicated in her appeal that the Social Security Act's definition of "disability" and the Policy's definition of "other occupation" disability are substantially the same. The Policy's definition of disability is as set forth above. The Social Security Act's definition of disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." (AR 142 quoting 42 U.S.C. § 423(d).) Further, an individual is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…" (Id. quoting 42 U.S.C. § 423(d)(2).  Having set forth the issues raised by Crist, the analysis turns to the reasoning process used by Liberty in arriving at its decision to deny long-term benefits under the "any occupation" definition of disability in the Policy.

## C. Liberty's Decision

In this case, Liberty is given a clear grant of discretion. Therefore, rather than engage in a de novo review of the AR, Liberty's decision to deny Crist long-term disability benefits under the "any occupation" definition of disability set forth in the Policy is reviewed to determine if it was arbitrary and capricious. Liberty's decision is examined to determine if it was the result of a

deliberate principled reasoning process, is supported by substantial evidence and is rational in light of the Policy's provisions.

Rather than using the post hoc rationalization set forth in Liberty's Motion for Judgment On the Administrative Record, the documents and other evidence in the AR reflecting Liberty's decision-making will be examined. Liberty's decision-making will be examined in light of the evidence that it considered, the evidence that was available to consider and the issues raised by Crist.

The AR reflects four key opinions upon which Liberty bases its decisions. They are the medical records review by Dr. Matthew, the FCE conducted by Paul Turner, the TSA performed by Mary O'Malley and the IME conducted by Dr. Koppenhoefer. Also, Liberty's initial decision to deny long-term disability benefits under the "any occupation" provision is documented in a letter sent to Crist on July 24, 2003, and Liberty's decision on Crist's appeal is documented in a letter sent to Crist on November 17, 2003. Each of these decisions and the opinions upon which they are based will be examined in light of the AR and the issues raised by Crist. First presented is a brief background for Liberty's decision-making process regarding long-term disability benefits under the "any occupation" definition of disability.

**1. Background**

Liberty initially granted Crist all of the short-term and long-term disability benefits available under the self-insured provisions of the Plan. Liberty then granted Crist twenty-four months of long-term disability benefits under the "own occupation" definition of disability in its Policy. Crist was granted a maximum length of long-term disability benefits under the "own

occupation" definition based upon diagnoses of seronegative rheumatoid arthritis, fibromyalgia, hyperlipidemia, chronic fatigue syndrome and diplopia.

Also in the background of Liberty's decisions is Liberty's conflict of interest and predetermination that Crist was not eligible for benefits under the "any occupation" definition. Liberty had a conflict of interest because it is both the administrator of the Policy and the insurer that ultimately pays the benefits. This conflict of interest was exacerbated because all of the experts relied upon by Liberty to reach its decisions were either Liberty employees or individuals hired by Liberty to give them an opinion.

The AR also includes evidence that Liberty predetermined that Crist was not going to be eligible for long-term benefits under the "any occupation" definition even before the final decision was made to grant her benefits under the "own occupation" definition. Liberty again predetermined that Crist was not eligible for long-term disability benefits under the "any occupation" definition before the TSA was conducted.[10] It is against this backdrop that Liberty's decisions are analyzed to determine if they are arbitrary or capricious.

**2. Medical Record Review**

As the end of the period of "own occupation" disability neared, Liberty sent Crist's records, including video tapes, to Dr. Anna Matthew for an independent peer review. Dr. Matthew's review was completed on February 4, 2003.

In response to specific questions asked by Liberty, Dr. Matthew concluded that the medical evidence submitted by Crist supported diagnoses of fibromyalgia, hypothyrodism,

---

[10]The TSA concluded several "potential alternative occupations" were consistent with Crist's skills, education and work experience.

obstructive sleep apnea with periodic limb movements and dysmetabolic syndrome. Dr. Matthew found the diagnosis of seronegative rheumatoid arthritis to be questionable.

Dr. Matthew found that, with a rehabilitative type of physical therapy and aggressive treatment of her sleep apnea, Crist should be able to work full time "at the sedentary type of work that she holds" and that days that Crist has flare ups and more discomfort and pain "could be managed with an FMLA situation with her employer." Dr. Matthew's opinion was based upon her review of the medical records that were sent to her, her discussing Crist's case with Dr. Pelfrey and her review of the video tape.

Crist challenges Dr. Matthew's opinion for two reasons. Crist argues that Dr. Matthew was not given all of her records and that some of the records Dr. Matthew was given and relied upon were flawed.

In support of her argument that Dr. Matthew was not given all of the records, Crist points to Liberty's claim notes which indicate that Dr. Matthew's was given "relevant filed data" for her review. Dr. Matthew's report does not indicate specifically which records she reviewed. Yet, Liberty now responds that all "relevant documents" means all medical records available to Liberty at the time. However, the AR does not show that Dr. Matthew was given all of Crist's records.

Dr. Matthew indicates that she reviewed the video tapes. She concluded that the video tapes revealed Crist "to be in no distress or pain and doing a variety of functional tasks that suggested that she was functioning at that time, at least between a sedentary to a light level of work." On the video tapes reviewed by Dr. Matthew, Crist was affirmatively seen four times and she was seen to be walking, driving her automobile and possibly working while sitting in her

garden area. However, the video tapes used by Dr. Matthew also showed one women who was not Crist walking a dog and one woman who was not Crist jogging. Therefore, Dr. Matthew relied upon flawed surveillance in reaching her conclusion.

**3. The FCE**

Next, based upon Liberty's suggestion and the agreement thereto by Dr. Matthew and Dr. Pelfrey, Liberty commissioned HealthSouth Rehabilitation Center of Dayton to conduct a two-day FCE "to provide measurements of physiological response to pain complaints" and to determine what functional level of activity Crist was capable of in an eight-hour day.

The FCE was conducted on March 25 and 26, 2003, by Paul R. Turner. The FCE was based upon diagnoses of rheumatoid arthritis and fibromyalgia and used an "any occupation" format. After conducting the FCE, Turner concluded that Crist "would more effectively tolerate SEDENDTARY physical demands of work for a typical 8 hour work day according to the standards of the US Department of Labor."

Crist now argues that Liberty knew that it is not the pain measured during the actual participation in a functional capacity evaluation that is most relevant. Instead, it is the effect upon the person in the hours and days that follow physical exertion that is most relevant, particularly where, as with Crist, the disability is characterized by chronic pain and fatigue. This is why, according to Crist, that Liberty commissioned the surveillance of Crist the day before and the two days of the FCE, surveillance that showed inactivity except for traveling to and from the FCE. This argument has merit, particularly since the plan requires that Crist be unable to perform, **with reasonable continuity**, all of the material and substantial duties of her own or any other occupation.

Crist also argues that the conclusion reached by Liberty that Crist is capable of sedentary activity based upon the FCE is flawed. It is flawed, according to Crist for two reasons. One is that the FCE was for a total of three and one half hours, two hours on the first day and one and one half hour on the second day and, therefore, is not long enough to reflect Crist's disability that is characterized by chronic pain and fatigue. Further, the surveillance shows that Crist was totally inactive after each day of the FCE.

The second reason that the conclusion reached by Liberty that Crist is capable of sedentary activity is flawed is that it is not consistent with the Policy. The Policy requires that Crist be able to perform a job with **reasonable continuity.** Yet, the FCE is conducted for only three and one half hours over a two day period and does not reflect Crist's disability that is characterized by chronic pain and fatigue.

The FCE results were then communicated to Dr. Pelfrey. Dr. Pelfrey responded that Crist "has continuous pain, severe most of the time, everyday." She also responded that, "[t]he key word is "sustained. Anne can on rare occasion work almost a full day, but then she is set back for several days with severe pain and fatigue afterwards."

Dr. Pelfrey attached the letter from Dr. Valle to her response. Dr. Valle, indicates that he had seen Crist on March 20, 2002, and noted no changes since his initial diagnosis of fatigue and excessive daytime sleepiness due to fibromyalgia, mild positionally dependent obstructive sleep apnea with periodic limb movements. He also indicates that he could not totally exclude a central nervous system hypersomnia due to remote encephalitis. (Id.)

**4. The TSA**

Following receipt of the FCE and prior to obtaining the response from Dr. Pelfrey, Liberty referred Crist's case to Mary Paine O'Malley, a vocational/disability consultant, for a TSA. The TSA was based upon the sedentary functional capacity outlined by Dr. Matthew. As a result of the TSA, O'Malley identified several "potential alternative occupations" that she determined were consistent with Crist's skills, education and work experience.

Crist now points out that O'Malley was unable to obtain a formal written job description and had to construct one. Further, the one that was constructed did not reflect that Crist was allowed to work out of her home and was, therefore, better able to manage her fibromyalgia. Crist further argues that none of the job positions identified by the TSA provide for work at home. As a result, the TSA did not address whether Crist would be able to manage her fibromyalgia by working out of her home.

Crist also challenges the jobs identified by the TSA. With regard to the Policy requirement of being able to perform with "**reasonable continuity**,"[11] One of the positions "seeks an aggressive, dependable individual" and, according to Crist, due to her chronic pain and fatigue, she lacks the required dependability. Also, one of the jobs identified requires driving as a condition of the job. Yet, Dr. Pelfrey has said that driving is not something that Crist could do on a sustained basis. The fact that Crist had worked out of her home is also relevant to the "reasonable continuity" requirement. These challenges have merit in light of the "**reasonable continuity**" requirement.

**5. The IME**

---

[11]Neither the Plan nor the Policy defines "reasonable continuity" and Liberty has not addressed this issue in its Briefs.

Following completion of the TSA, Liberty engaged Dr. Ron Koppenhoefer, a physiatrist, to conduct an IME of Crist. Dr. Koppenhoefer examined Crist on May 19, 2003.

Dr. Koppenhoefer identified the medical records to which he referred. They included records brought to him by Crist and records provided by Liberty. The records provided by Liberty included the surveillance reports and the associated video tapes.

Dr. Koppenhoefer found no objective evidence of musculoskeletal pathology but did find a neurological impairment of the sixth nerve paralysis. (Id.) He concluded that Crist's "subjective complaints outweigh the objective findings at this time." He noted that the surveillance tapes showed Crist to be capable of doing more physical activities than what Crist said she was doing and concluded that he found no objective evidence to indicate that Crist was unable to perform sedentary work "at this time for an eight hour day."

Although Crist does not identify specific records, she now argues that Dr. Koppenhoefer was not given records of her treating physicians. However, this allegation is not well-founded. Dr. Koppenhoefer reports having activities information forms dated March 9, June 1 and November 6, 2001, Dr. Shaw's letter to Dr. Pelfrey, Dr. White's letter to Dr. Pelfrey, MRI of the brain by Dr. Sulek, records from Dr. Juergens and Dr. Matthew's report which includes references to Dr. Pelfrey's findings.

Crist also argues that Dr. Koppenhoefer's review of the records was inadequate because he indicates that Crist is being treated for depression but the records do not show this. While this may be true, it is not particularly relevant and Crist has not shown that it is.

Crist points out that Dr. Koppenhoefer was prevented in his review from testing for causality. Crist then argues that, because at least one of Crist's disabilities is fibromyalgia, the

-46-

limit placed on Dr. Koppenhoefer precluded him from evaluating the cause and the effects of the fibromyalgia on Crist. However, Dr. Koppenhoefer was aware of the fibromyalgia diagnosis and not precluded from considering its effect.

Dr. Koppenhoefer indicated that he found no objective evidence of musculoskeletal pathology. However, he did not perform the trigger point test to verify fibromyalgia. While his conclusion regarding no objective evidence may be accurate, its use to determine that Crist is capable of sedentary activity is questionable in light of much subjective evidence of fibromyalgia.

Finally, like Dr. Matthew, Dr. Koppenhoefer relied upon the flawed surveillance video tapes. He noted that the activity on the surveillance tapes and records was consistent with Crist's presentation in his office and that the video tapes showed Crist capable of doing more physical activities than what she presented to him.

The IME results were then sent to Dr. Pelfrey. Liberty received no response from Dr. Pelfrey prior to issuing its decision denying the long-term disability benefits.

**6. The Denial of "Any Occupation" Benefits**

On July 24, 2003, Liberty sent Crist a letter informing her that she would not be entitled to long-term disability benefits under the "any occupation" definition in the Policy. This letter serves as the documentation of Liberty's decision.

Liberty begins by indicating that it has medical documentation from Dr. Pelfrey that Crist is totally and permanently disabled on an ongoing basis. Liberty then conducted the claim file review which concluded that Crist was capable of full-time sedentary to light work "if not more"

-47-

and that none of the diagnoses submitted by Crist and her physician warrant total and permanent disability.

Liberty next indicated that it conducted the FCE which concluded that Crist was capable of performing full time sedentary capacity work. The results of the FCE were then sent to Dr. Pelfrey for review and comment.

Dr. Pelfrey, according to Liberty's letter, responded saying that Crist was seen every three months, that she complains of continuous pain, severe most of the time, everyday. Dr. Pelfrey also indicated that Crist was unable to exercise regularly and her daily living activities were limited due to pain. Dr. Pelfrey also states that Crist can, on rare occasions, work almost a full day but then she is set back for several days with severe pain and fatigue after work. Liberty concluded that Dr. Pelfrey did not provide objective medical information to support her disagreement with the FCE results.

Liberty says it next conducted an IME and reports the results of the IME which concluded that there was no objective evidence to indicate that Crist was unable to perform sedentary work activities at the time on an eight hour day and that the restrictions placed upon Crist by her attending physicians were somewhat unreasonable. The IME results were sent to Dr. Pelfrey who had not responded, according to Liberty, by the date of the letter.

Liberty says it next conducted a TSA.[12] The TSA showed that Crist had transferable skills and the ability to perform with reasonable continuity the material and substantial duties of certain occupations.

---

[12]The dates on the records in the AR indicate that the TSA was performed before the IME.

Liberty concluded that Crist did not meet the "any occupation" definition of disability. Crist's long-term disability benefits were, therefore, terminated after July 23, 2003, and Crist was notified of her right to request a review of this decision.

**7. The Appeal**

Crist appealed Liberty's decision in a letter dated October 17, 2003. In her appeal, Crist presented new information and identified several alleged errors in the information that Liberty had considered.

One piece of new information provided to Liberty was that Crist had been approved for Social Security disability benefits. Crist also indicated that the Social Security Act's definition of "disability" and the Policy's definition of "other occupation" disability are substantially the same. In addition to the Social Security information, Crist provided a copy of Dr. Pelfrey's response to Liberty's request for comments on the IME and an x-ray of her feet which allegedly shows erosions.

Regarding alleged errors, Crist identified several problems with the surveillance and associated video tape. She described conflicts between Liberty's case notes and Liberty's conclusions, she raised the "reasonable continuity" issue, and she indicated problems with the medical record review and the IME.

**8. Denial of the Appeal**

In a letter dated November 17, 2003, Liberty Life denied Crist's appeal. Liberty indicated that it had outlined the basis for its denial in its letter of July 24, 2003. Liberty then reiterated its basis for denial in more detail than was given in the letter of July 24, 2003. After summarizing the results of the medical record review, the FCE, the IME and the TSA, and the responses of

Crist's treating physicians thereto, Liberty concluded that, "based on the totality of the three independent medical opinions and vocational information contained in your file, our previous decision that you have sedentary capacity is reasonable and substantiated by the record. Therefore, no further long term disability benefits are payable."

**9. Conclusion**

Crist has shown that Liberty did not engage in a deliberate principled reasoning process. First, the medical record review conducted by Dr. Matthew concluded that Crist should be able to work full time at a sedentary type of job and that days that Crist's flare ups could be managed with an FMLA situation with her employer. Yet, Dr. Matthew's review was based upon unreliable and incomplete evidence.

Dr. Matthew relied upon flawed surveillance tapes that, in part, showed a female, who was not Crist, jogging. Also, the AR indicates that Dr. Matthew was given only the "relevant" records from Crist's file and Dr. Matthew's report does not indicate specifically which records she reviewed. Liberty now responds that all "relevant documents" means all medical records available to Liberty at the time, but this post hoc rationalization is not supported by the AR.

Liberty next conducted an FCE. The FCE was conducted for two hours on one day and for one and one half hour on the next day. The results were that Crist would "more effectively" tolerate SEDENDTARY physical demands of work for a typical 8 hour work day. However, this is not rationally long enough to assess Crist's disability that Liberty knew was characterized by chronic pain and fatigue.

The FCE conclusion is also flawed because it is not consistent with the Policy. The Policy requires that Crist be able to perform a job with **reasonable continuity.** Performing for

two hours one day and one and one half hours the next day is not performing with reasonable continuity, particularly the reasonable continuity that an employer would expect.

Liberty says Crist's argument that the effect on the person in the hours and days that follow physical exertion is most relevant is "Hogwash." Perhaps what is really "Hogwash" is a two-day FCE that turns out to be a total of three and one half hours and surveillance alleged to be on the two days of the FCE and the day after that is really conducted on the day before and the two days of the FCE with no surveillance on the day after.

Liberty next commissioned a TSA. The TSA was conducted before Liberty received Dr. Pelfrey's response to the FCE and before the IME. The TSA was based upon the sedentary functional capacity outlined by Dr. Matthew and in the FCE. The results of the TSA identified several "potential alternative occupations" that were consistent with Crist's skills, education and work experience.

However, the results of the TSA are also flawed. They are flawed because they rely upon the flawed medical records review and the flawed FCE. They are also flawed because there is no evidence that Crist can perform the jobs identified in the TSA with the "reasonable continuity" required by the Policy or that Crist can manage her fibromyalgia by working out of her home or that Crist can drive to the extent required by the jobs identified. Finally, the results of the TSA are flawed because Dr. Matthew's conclusion regarding Crist's ability to manage her fibromyalgia with an FMLA situation was not considered.

Liberty next commissioned an IME which was conducted on May 19, 2003. Dr. Koppenhoefer, who conducted the IME, identified the medical records to which he referred. They included records brought to him by Crist and records provided by Liberty.

-51-

The records provided by Liberty included the surveillance reports and the associated video tapes, including the tapes showing two women who were not Crist jogging and walking a dog. Because Dr. Koppenhoefer relied, at least in part, on the flawed video tapes, his conclusions are suspect, at best.

Liberty relied upon the medical records review, the FCE, the TSA and the IME in concluding that Crist was not entitled to long-term disability benefits pursuant to the Policy's "any occupation" definition of disability. However, since all of these expert reports were flawed, and in light of the facts that Liberty was operating under multiple conflicts of interest and had apparently predetermined the outcome, Liberty did not engage in a deliberate principled reasoning process.

Liberty was then given an opportunity to address the issues which rendered their initial process arbitrary and capricious and elected not to. Liberty had been  notified of these issues in Crist's appeal. Liberty was also presented with additional evidence which it ignored in deciding to deny Crist's appeal. Therefore, Liberty's decision regarding Crist's appeal, again particularly in light of the facts that Liberty was operating under multiple conflicts of interest and had apparently predetermined the outcome, is not the product of a deliberate principled reasoning process.

**a. Additional Evidence**

One bit of additional evidence presented by Crist with her appeal that deserves additional examination is the determination that she had been approved for Social Security Disability Benefits. Crist also indicated that the Social Security Act's definition of "disability" and the Policy's definition of "other occupation" disability are substantially the same. While the Social

-52-

Security determination is not binding, it is also not meaningless, particularly where the definition of disability used by the Social Security Administration is nearly the same as that used by the Policy and where Liberty required Crist to apply for Social Security disability benefits and even asked for a partial return of prior payments that it had made to Crist when she received the Social Security benefits. Since the Social Security determination is not meaningless, it is medical evidence that should have been addressed by Liberty.

Liberty's Response to Crist's Motion indicates, "Social Security Evidence Weighed and not Ignored." (p. 15.) However, this post hoc rationalization is not supported by reference to evidence in the Response or by evidence in the AR.

Another piece of additional evidence deserving additional examination is Liberty's recognition, albeit indirectly, that it had received Dr. Pelfrey's response to the IME along with Crist's appeal. Dr. Pelfrey responded that, "there is no reliable test for fibromyalgia, subjective complaints are very important in determining a patient's condition." Yet, Liberty does not address the fact that there are currently no objective tests for fibromyalgia in its reasoning.

Finally, deserving additional examination, Crist provided an x-ray of her feet along with her appeal. Crist argued that she had been having serious trouble with her right foot and that the x-ray showed "erosions" in both feet.[13] Yet, this issue was not addressed by Liberty. Having reviewed the reasoning process used by Liberty in denying benefits to Crist and denying her appeal, the analysis turns to specific issues raised by the Parties and not addressed above.

**b. Specific Issues Raised By the Parties**

---

[13]Bone erosion is an indication of rheumatoid arthritis.

The first specific issue not already addressed in this Conclusion regards the burden of proof. Liberty argues that Crist is under a **continuing** obligation to provide proof of disability as defined by the Policy. However, this interpretation is supported by the Policy language only to the extent that Crist must initially prove disability and then prove disability thereafter when called upon by Liberty.

The policy language provides that disability benefits will be provided when Liberty receives proof that a covered person is disabled and the benefit is to be paid if the covered person gives Liberty proof of continued disability. Perhaps Liberty has confused the requirement for proof of continued disability in the Policy with a requirement that Crist has a continuing obligation. The Policy indicates that Crist has a obligation to show that she meets the Policy definition of disability but not that she must continuously provide proof that she is disabled without being asked.

In this case, Crist provided proof of disability when asked. Liberty has, however, declined to accept and rely upon that proof.

The next issue is the quality of the proof of disability. Liberty argues that Crist must present "objective medical information" in support of her disability claim and that sufficient clinical medical evidence of Crist's disability must exist in the claim file for Crist to be disabled. However, the Policy does not require "objective medical information" nor does it require, as argued by Liberty  "sufficient clinical medical evidence." The Policy provides disability coverage when Liberty receives proof that a Covered Person is Disabled due to Injury or Sickness and requires the regular attendance of a Physician. This is particularly relevant since

both Parties agree that Crist is suffering from fibromyalgia and there is currently no known objective medical evidence of fibromyalgia.

The next issue is Dr. Pelfrey's findings. Liberty agrees that Crist has fibromyalgia but criticizes Dr. Pelfrey's other findings as having "troubling inconsistencies, misdiagnoses and lacking a stated basis. Liberty first argues that there was a sudden and unexplained change in Crist's condition in February of 2001. However, Dr. Pelfrey consistently maintained that Crist suffers from fibromyalgia,[14] a conclusion with which Liberty now agrees. Also, Dr. Juergens, another of Crist's treating physicians listed fibromyalgia as a diagnosis for Crist as early as August 30, 1996.

Liberty also argues that Dr. Pelfrey misdiagnosed Crist as having rheumatoid arthritis. Dr. Shaw, a specialist to whom Crist was referred by Dr. Pelfrey, opined that Crist did not have rheumatoid arthritis, yet Dr. Pelfrey continued to diagnose rheumatoid arthritis. However, the AR indicates that Dr. Pelfrey continued to report symptoms that are akin to both fibromyalgia and rheumatoid arthritis so a suggestion that Crist had rheumatoid arthritis is not unreasonable.

Finally, Liberty criticizes Dr. Pelfrey's reliance upon Mr. Yoggi, her doctor's assistant. Mr. Yoggi is known to have seen Crist and to have completed some of the forms submitted to Liberty. However, Dr. Pelfrey signed off on all of the relevant forms and Liberty has not shown that Dr. Pelfrey does not agree with the contents thereof.

The next issue is Liberty not following its own management plan. However, this issue requires no further discussion because the Court has already determined that Liberty did not use a deliberate principled reasoning process.

_____

[14]Dr. Pelfrey listed fibromyalgia in her progress note of September 4, 1996, the earliest progress note requested by Liberty.

The final issue involves Crist's secondary diagnoses. She argues that there is medical evidence in the AR showing that she suffers from secondary disabling conditions, other than fibromyalgia, that contribute to her disability. She specifically identifies diplopia and points to evidence in the AR that her diplopia was worsening. However, this issue also need not be addressed because the Court has already determined that Liberty did not use a deliberate principled reasoning process regarding fibromyalgia.

In sum, Liberty did not use a deliberate principled reasoning process in its decision to deny Crist long-term disability benefits under the "any occupation" definition of disability and Liberty's decision was not rational in light of the Policy provisions. The analysis next turns to the appropriate remedy.

### c. The Remedy

Once a court determines that a plan administrator acted arbitrarily or capriciously in denying a claim for benefits, it can either remand for a renewed evaluation or award a retroactive reinstatement of benefits. *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003). A remand is the proper remedy in cases where it is unclear that the claim should be granted. *Williams*, 227 F.3d at 715. However, where the review of the medical evidence was arbitrary and capricious or unreasonable, and, but for the plan administrator's arbitrary and capricious conduct, the insured would have continued to receive benefits, the proper remedy is to retroactively grant benefits without a remand. *Id.; Cook*, 320 F. 3d at 24. Where a denial of benefits is reversed and benefits are granted, the court is to order the insurer to award benefits plus interest from the date on which the benefit payments ceased. *Calvert*, 409 F.3d at 297.

In this case, the Parties agree that Crist has fibromyalgia. There is also evidence in the AR that Crist is totally disabled and unable to perform, with reasonable continuity, all of the material and substantial duties on her own or any other occupation for which she is reasonably fitted. Further, Liberty's decision to deny Crist long-term disability benefits under the "any occupation" definition of disability was arbitrary and capricious and not rational in light of the Policy provisions. Therefore, Liberty is hereby ordered to provide long-term disability benefits to Crist, pursuant to the Policy, plus interest from the date on which Liberty ceased providing long-term disability benefits. Liberty is ordered to provide these benefits for as long as Crist is disabled under the terms of the Policy.

Crist's Motion for Judgment On the Administrative Record is GRANTED and Liberty's Motion for Judgment On the Administrative Record is OVERRULED. Crist is given until not later than thirty days from entry of this Order to submit a motion requesting any attorneys' fees and other benefits to which she may believe that she is entitled under ERISA. This motion should be supported by appropriate evidence and reference to legal authorities. Finally, The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Fourth day of May, 2006.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record